IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| JOHN RAYMOND HARRIS, | ) | CASE NO.  1:18-cv-01984 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |


Plaintiff John Raymond Harris ("Plaintiff" or "Harris") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying his application for social security disability benefits.  Doc. 1.  This Court has jurisdiction

pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate Judge pursuant to

the consent of the parties. Doc. 11.

For the reasons explained herein, the Court finds Harris's Appointments Clause challenge

is not a basis for reversal and remand.  However, for the reasons discussed below, the Court is

unable to assess whether the Step Three determination and/or RFC are supported by substantial

evidence.  Thus, the Court **REVERSES and REMANDS** the Commissioner's decision for

further proceedings consistent with this opinion.

### I.  Procedural History

On April 6, 2016, Harris protectively filed[1] an application for disability insurance benefits ("DIB").[2]  Tr. 12, 63, 159-160.  Harris alleged a disability onset date of February 26, 2014.  Tr. 12, 159.   He alleged disability due to spinal stenosis, myopathy, nerve pain, arm pain, shoulder pain, back pain, leg pain, and carpal tunnel syndrome.  Tr. 66, 89, 97.

After initial denial by the state agency (Tr. 89-95) and denial upon reconsideration (Tr. 97-103), Harris requested a hearing (Tr. 104-105).  A hearing was held before the ALJ on November 30, 2017.  Tr. 35-62.  On December 7, 2017, the ALJ issued an unfavorable decision (Tr. 9-24), finding that Harris had not been under a disability within the meaning of the Social Security Act, from February 26, 2014, through September 30, 2016, the date last insured (Tr. 12, 20).  Harris requested review of the ALJ's decision by the Appeals Council.  Tr. 155-158.  On June 27, 2018, the Appeals Council denied Harris's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.      Personal, vocational and educational evidence

Harris was born in 1963.  Tr. 159.   He was 54 years old at the time of the hearing.  Tr. 41.  Harris lived alone in a ranch-style house.  Tr. 41.  Harris graduated from high school.  Tr. 41.  He had some vocational training but did not complete the program.  Tr. 41.  Harris last worked at the end of 2015 as a tool and die maker.  Tr. 42.  When Harris stopped working in 2015 he was only working four to eight hours per week.  Tr. 42.  Most of Harris's past work

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/8/2019).

[2] Harris also filed an application for supplemental security income ("SSI").  Tr. 27.  That application was denied on May 3, 2016, because his resources exceeded $2,000.00.  Tr. 27-34.  Harris's SSI application is not part of this appeal.  Doc. 14, p. 3.

involved tool and die making.  Tr. 42, 43-45.  Harris estimated lifting about 100 pounds and

being on his feet about 90% of the time for most of the jobs he worked.  Tr. 55-56.

**B.     Medical evidence**

   **1.     Treatment history**

On February 26, 2014, Harris saw Beejadi N. Mukunda, M.D., with the Atrium Medical

Group, for a routine general medical examination after not having seen a primary care physician

in over 15 years.  Tr. 284-286.  Harris complained of arthritis in the elbows, hands and neck and

obesity.  Tr. 284.  Harris reported that his pain was a 3-4/10 and he indicated that he felt numb

most of the time.  Tr. 284.  Harris reported frequently lifting a lot of heavy objects at work.  Tr.

284.  Harris indicated he had gained 30 pounds over the prior three years and he did not exercise.

Tr. 284.  A "review of system" was positive for arthralgias and neck pain but negative for

myalgias and leg cramps.  Tr. 284.  Dr. Mukunda's musculoskeletal physical examination

findings revealed no muscular tenderness but there was muscular weakness; there was no joint

swelling; there was crepitus, decreased range of motion, and weak right upper extremity muscles

and in the small hand muscles.  Tr. 285.  Dr. Mukunda's neurological examination showed

diminished fine touch and vibration in the right 4th and 5th fingers.  Tr. 285.  Dr. Mukunda

ordered a variety of tests, including x-rays, and referred Harris to Dr. Mandel regarding arthritis.

Tr. 286.

On March 11, 2014, x-rays were taken, including a cervical spine x-ray and an x-ray of

Harris's right elbow.  Tr. 261-263.  The impression from the cervical spine x-ray was

degenerative changes of the cervical spine, most pronounced from C4-C7.  Tr. 261.  The

impression from the elbow x-ray was evidence of lateral epicondylitis; concern for small loose

body in the joint space of the right elbow; and small spur arising from the olecranon.  Tr. 263.

On March 27, 2014, Harris saw Dr. Mukunda with complaints of right-hand numbness and right elbow pain. Tr. 287-289. Harris had seen Dr. Mandel and received a cortisone injection but he was not any better. Tr. 287. Dr. Mandel had started Harris on meloxicam. Tr. 287. Harris had also started taking Lipitor and had been taking it for 3 weeks. Tr. 287. Harris was watching his diet and indicated he was going to start exercising. Tr. 287. A "review of system" was again positive for arthralgias and neck pain but negative for myalgias and leg cramps. Tr. 287. Musculoskeletal and neurological physical examination findings were similar to findings from the February 26, 2014, visit. Tr. 288. Dr. Mukunda's assessment was "mixed hyperlipidemia" and "other enthesopathy of the elbow region." Tr. 288. Dr. Mukunda recommended that Harris continue taking Lipitor, start exercising, follow up with Dr. Mandel, return for a blood draw in three weeks, and stop smoking. Tr. 289.

Harris saw Dr. Mukunda on March 5, 2015, complaining of problems with his elbows and indicating that he felt he was losing strength in his arms. Tr. 290. Harris had not seen Dr. Mandel since receiving the cortisone injection because Harris felt that the injection did not help. Tr. 290. Harris reported that he was continuing to have right elbow pain and numbness in his fourth and fifth digits as well as right shoulder pain. Tr. 290. Dr. Mukunda's musculoskeletal physical examination findings revealed no muscular tenderness but there was muscular weakness; there was no joint swelling; there was crepitus, decreased range of motion, weak right upper extremity muscles, and numbness in the right hand (4-5th digits). Tr. 291. Harris had full range of motion in his neck. Tr. 291. Dr. Mukunda referred Harris to Dr. Tessman regarding Harris's right upper extremity weakness and numbness in the 4-5th digits. Tr. 292.

On April 7, 2015, an MRI of Harris's cervical spine was performed. Tr. 258-260. The impression was multilevel degenerative changes with various degrees of canal and foraminal

narrowing noted throughout the cervical spine with the findings most significant at the mid and lower cervical levels.  Tr. 259.

Harris saw Dr. Mukunda on October 12, 2015.  Tr. 293-295.  Harris was continuing to have the same problem with muscle weakness.  Tr. 293.  Harris was not following up with the neurologist as directed.  Tr. 293, 295.  Harris reported that he was continuing to get weaker.  Tr. 293.  He was not having chest pain or shortness of breath.  Tr. 293.  He reported swelling of the joints.  Tr. 293.  Harris had been trying to lose weight.  Tr. 293.  Harris reported generalized weakness that was worse with exertion.  Tr. 293.   Musculoskeletal physical examination findings included no joint swelling, crepitus, weak right upper extremity muscles, and numbness in the right hand (4-5th digits).  Tr. 294.  Nuerologically, Dr. Mukunda observed diminished fine touch in the right 4th and 5th fingers.  Tr. 294.  Dr. Mukunda's assessment was mixed hyperlipidemia; bursitis of elbow, unspecified elbow; and muscle weakness (generalized).  Tr. 295.  Harris was referred to Dr. Tessman for his right upper extremity weakness.  Tr. 295.  He was advised to refrain from lifting heavy weights until seen by a neurologist.  Tr. 295.

Harris returned to see Dr. Mukunda on November 9, 2015, for a one-month follow-up visit.  Tr. 296-298.  Harris had restarted Gabapentin on his own.  Tr. 296.  Harris had not yet seen Dr. Tessman.  Tr. 296.  Harris reported that he was worsening overall.  Tr. 296.  He indicated that his muscles gave out sometimes and then they would get better.  Tr. 296.  Harris had not had any falls but he had missed four days of work during the prior month.  Tr. 296.  Physical examination findings were similar to past findings.  Tr. 297.  Dr. Mukunda's assessment was muscle weakness (generalized) and paresthesia of the skin.  Tr. 297.  Dr. Mukunda advised Harris to continue taking Gabapentin.  Tr. 298.  Harris was again referred to a neurologist (Dr. Kutsikovich/Dr. Mars) for an evaluation.  Tr. 298.

Harris saw Harold Mars, M.D., on November 16, 2015, for a neurologic consultation. Tr. 327-330. Dr. Mars noted that Harris's chief complaint was muscle pain and weakness. Tr. 327. Harris reported that, about one and one-half years prior, he started to have numbness in his right elbow and extending into his 4th and 5th digits with some weakness in his hand as well as increasing pain and discomfort in his right shoulder, extending into his neck. Tr. 327. Also, about six months prior to his visit with Dr. Mars, Harris noted increased numbness in his legs and some muscle cramps affecting his calves and thighs. Tr. 327. Harris also reported increasing difficulty with expression, with his speech, and occasional posterior occipital pain. Tr. 328. He had received injections in his right elbow without any benefit. Tr. 328. Harris was taking Gabapentin. Tr. 328. Dr. Mars's diagnosis was "[p]redominantly bilateral cubital fossa syndrome, myofascitis, carpal tunnel syndrome, more on the right than the left." Tr. 329. Dr. Mars also indicated that Harris demonstrated "some atrophy of the right hypothenar eminence [and] has diminished sensation over digits 5 with a split on 4." Tr. 329. Dr. Mars requested an electromyogram of the upper extremities and planned to see Harris following that test. Tr. 330.

Harris had nerve conduction studies performed on November 18, 2015. Tr. 331. Only one page of the electromyography report is included in the record and no impressions are noted thereon. Tr. 331; Doc. 14, p. 7.

On March 7, 2016, Harris saw Dr. Mukunda. Tr. 248-250. Harris continued to complain of "aching pain all over, in shoulders, hips, legs, some days it gets so bad he cannot walk." Tr. 248. Dr. Mukunda noted that Harris had an MRI and had seen neurology. Tr. 248. Harris indicated that his condition was worsening. Tr. 248. Harris's mother was helping him at times. Tr. 248. Harris was thinking about applying for disability because he was having a hard time working. Tr. 248. On physical examination, Harris's strength in his bilateral upper extremities

was 3-5/5. Tr. 249. Dr. Mukunda's assessment included myalgia and cervical spondylosis with myelopathy. Tr. 250. For Harris's myalgia, Dr. Mukunda referred Harris for pain management and Dr. Mukunda referred Harris to neurosurgery and pain management for consults regarding the cervical spondylosis myelopathy. Tr. 250.

Harris saw Dr. Mukunda the following month on April 5, 2016. Tr. 247-248. Harris described his joint pain as on and off, moderate to severe. Tr. 247. Harris was not going to pain management and he had not been taking Gabapentin or Lyrica for about 2 weeks. Tr. 247. Harris explained he did not like Gabapentin; he did not like to use narcotics; and was not interested in following up with pain management. Tr. 247. Harris was interested in exercising and trying to get better. Tr. 247. Harris had an appointment scheduled with a neurosurgeon in June. Tr. 247. Physical examination findings were unremarkable. Tr. 247. Dr. Mukunda's assessment was arthralgia, unspecified joint and he referred Harris to Dr. Anabelle Morales Mean. Tr. 248.

Harris saw Dr. Mukunda on September 2, 2016. Tr. 350-353. Harris complained of neck pain that he had been having for a few years. Tr. 350. He described the pain as severe, on and off, and radiating into both shoulders and arms. Tr. 350. Harris had increasing weakness in his hands bilaterally and was unable to lift heavy objects. Tr. 350. Harris also complained of low back ache that was severe, sharp and radiated into his gluteal areas. Tr. 350. Harris was using two canes at times to walk. Tr. 350. On physical examination, Harris exhibited 3-4/5 strength in his bilateral upper and lower extremities. Tr. 351. Harris's reflexes were diminished in his right upper extremity and absent in his knees and ankles. Tr. 351. Harris's sensation was intact. Tr. 351. His gait was cautious and antalgic. Tr. 351. Dr. Mukunda assessed cervical neck pain with evidence of disc disease and radiculopathy. Tr. 351. Harris requested an order for an MRI. Tr.

351.  Dr. Mukunda ordered cervical and lumbar spine MRIs.  Tr. 351.  Dr. Mukunda recommended that Harris obtain prior authorization from his insurance company before having the test performed because insurance might not approve.  Tr. 351.  Dr. Mukunda referred Harris for a neurology evaluation.  Tr. 351.  Harris inquired about medical marijuana for spinal injury patients.  Tr. 351.  Dr. Mukunda advised Harris to contact the pain management specialists regarding that inquiry.  Tr. 351.

Harris saw Dr. Mars for a follow up on September 19, 2016.  Tr. 334.  Harris's chief complaint at the visit was muscle pain and weakness.  Tr. 334.  The treatment notes from the visit are incomplete – only the first page is included.  Tr. 334.   Later in the record, there are two undated pages of medical records, labeled pages 2 and 3, that appear to be from Dr. Mars.  Tr. 343-344.

The cervical and spine MRIs were performed on October 4, 2016.  Tr. 320-325.  The cervical spine MRI showed degenerative changes, most pronounced at C4-C7, with mild ventral cord flattening; there were no signal changes within the cord to suggest edema or myelomalacia; and mild multilevel bilateral neural foraminal narrowing.  Tr. 320.  The lumbar spine MRI showed degenerative changes, most pronounced at L4-5, with moderate to severe spinal canal narrowing, at the L3-4, with moderate spinal canal narrowing; diffuse disc bulge and superimposed left paracentral protrusion at L5-S1, resulting in partial effacement of the left subarticular recess affecting the descending left S1 nerve root sheath.  Tr. 320.

Harris saw Dr. Mars for follow up on October 17, 2016.  Tr. 338-339.  Harris's chief complaints were back pain, neck pain and headaches.  Tr. 338.  Dr. Mars indicated that the MRI of the lumbar spine showed severe stenosis at L4-5.  Tr. 338.  Dr. Mars's testing revealed intact strength in the arms and legs proximally and distally.  Tr. 339.  Sensation to light touch and pin

prick on the arms and legs was normal and gait was normal. Tr. 339. There was tightness present in the paraspinous musculature. Tr. 339. Dr. Mars diagnosed myofascitis and ordered an EMG. Tr. 339. Nerve conduction testing was performed on November 1-2, 2016. Tr. 340-342. The impression was right median neuropathy at or distal to the wrist, consistent with carpal tunnel syndrome; left median neuropathy with amplitude change and conduction velocity slowing; mild right ulnar motor neuropathy with mild conduction velocity showing and delayed latency on the left; acute cervical radiculopathy could not be evaluated; and chronic neurogenic changes were present in the right distal hand muscles. Tr. 342.

### 2. Opinion evidence

There are no opinions from treating sources or consultative examining physicians. There are opinions from state agency reviewing physicians.

On June 7, 2016, state agency reviewing physician Teresita Cruz, M.D., completed a physical RFC assessment. Tr. 69-72. Dr. Cruz opined that Harris had the RFC to occasionally lift/carry 20 pounds; frequently lift/carry 10 pounds; stand and/or walk 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday and was limited to occasional pushing/pulling with the right upper extremity. Tr. 70. Dr. Cruz opined that Harris could never climb ladders/ropes/scaffolds and could occasionally crawl. Tr. 70. Dr. Cruz opined that Harris was limited to occasional reaching with the right upper extremity and frequent handling, fingering, and feeling with the right upper extremity. Tr. 71. Dr. Cruz opined that Harris would have to avoid all exposure to hazards (machinery, heights, etc.). Tr. 71.

Upon reconsideration, on August 16, 2016, state agency reviewing physician Lynne Torello, M.D., completed a physical RFC assessment. Tr. 81-83. Dr. Torello reached the same conclusions regarding Harris's RFC as Dr. Cruz. Tr. 81-83.

**C.     Testimonial evidence**

**1.      Plaintiff's testimony**

Harris was represented and testified at the hearing.  Tr. 40-53, 55-56.  Harris explained that he stopped working at the end of 2015 because he was no longer able to perform his work.  Tr. 42.  Sometimes Harris had so much pain that he was unable to do anything.  Tr. 42.  He indicated that everything hurt him a lot – his shoulder, neck and back.  Tr. 42.  When the ALJ asked Harris why he felt he was disabled back before 2015, Harris indicated that it started with his neck being sore and he was having pain through his shoulder blades into his elbow.  Tr. 45-46.  Harris described it as feeling as though he had banged his funny bone all the time.  Tr. 45.  Also, his ring finger and little finger were very numb – he had a hard time holding things.  Tr. 45-46.  Initially the problems were only in his right extremity but, at the time of the hearing, he had problems in both his right and left arms and hands.  Tr. 46.  At work, it got to the point where, after a few hours, Harris was in so much pain that he just started going home.  Tr. 46.  In addition to the neck, shoulder and arm pain, Harris then started to have a hard time walking.  Tr. 47.  He estimated that he started to have problems with his lower back around the beginning of 2014.  Tr. 47.  Harris explained that, when he coughs, he has shooting pain that goes down his back and into his buttocks, legs and knees.  Tr. 47.  He loses all control of the muscles in his legs and it causes him to stumble.  Tr. 47.  After Harris stumbles, it takes him a few minutes to get back up.  Tr. 48.  The ALJ noted that Harris was using a cane at the hearing.  Tr. 48.  Although not prescribed by a doctor, Harris indicated he had been using his cane since February 2017.  Tr. 48.  Before getting a cane, Harris would use furniture to hold on to so he would not fall.  Tr. 49.

When Harris started having the additional problems with his lower back and legs, Harris returned to his doctors, who had diagnosed him with arthritis, because he did not think it was just

arthritis. Tr. 48. In 2015, he saw a neurologist. Tr. 48. Harris has not really had any treatment for his back. Tr. 49. In 2014 and 2015, Harris was not receiving treatment for his back – he was being treated for arthritis in his elbow. Tr. 49. Back in 2013, 2014, and 2015, Harris indicated that his pain level in his neck, elbow and shoulder was maybe a six or seven on a scale of one to ten. Tr. 53. Per Harris, his doctor indicated that there is not much that can be done to help Harris with his neck because of the way it is narrowed. Tr. 49. Harris does take Gabapentin and over-the-counter pain relievers. Tr. 49-50. Harris tries to stretch and move his neck around but he is very limited. Tr. 50. Harris was interested in physical therapy but his insurance company denied him coverage. Tr. 50. Back in 2015, Harris was able to lift an object weighing around 30 pounds if the object was waist level. Tr. 50. He was unable to physically lift such an object from the ground level and he could not lift things over his head. Tr. 51. If he tried to reach above his head, he would have ringing in his ears and would become disoriented. Tr. 51, 53. Harris would have to sit down for five or ten minutes. Tr. 51. At times, he would continue to feel disoriented all day. Tr. 51, 53.

Harris estimated being able to stand for about a half an hour and sit for about half an hour. Tr. 52. He has to alternate between sitting and standing and, as the day went on, he might have to change positions about every ten minutes. Tr. 52. Harris feels the most comfortable lying down in a fetal position with a pillow between his knees. Tr. 52. Harris only sleeps for a few hours and then he gets bad leg cramps and he has to get up and move around before he can lie back down. Tr. 52. He explained that normal daily activities like, for example, attending the hearing, wipe him out for the day. Tr. 52.

Harris had not been to a doctor in 2017 because he had a $6,000.00 deductible; he had spent $17,000.00 over the prior three years; and he could not afford to go to a doctor. Tr. 49.

## 2.      Vocational expert's testimony

The Vocational Expert Dr. Robert Mosley ("VE") testified at the hearing.  Tr.  54, 56-61.
The VE described Harris's work history as tool and die maker repairer, a medium, skilled job
and injection molding machine operator, a medium, skilled job, with Harris having performed
both jobs at the heavy exertional level.  Tr. 56-57.

The ALJ then asked the VE a series of hypothetical questions.  First, the ALJ asked the
VE to consider a hypothetical individual who is capable of light work and who can occasionally
push or pull or reach overheard with the right upper extremity; can never climb ladders, ropes, or
scaffolds; can occasionally crawl; can frequently handle and finger on the right hand; and must
avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial
driving.  Tr. 57.  The VE indicated that the described individual could not perform Harris's past
work.  Tr. 57.  There were other jobs that the described individual could perform, including
inspector and hand packager, assembler plastic hospital products,[3] and assembler electrical
products.  Tr. 57-58.  The VE provided national job incidence data for the identified jobs.  Tr. 58.

For his second hypothetical, the ALJ asked the VE to consider the individual described in
the first hypothetical but to assume that the individual can only occasionally hand and finger
with the right hand.  Tr. 58.  The VE confirmed that Harris's past work would not be available
but there would be other jobs available, including greeter, usher, and counter clerk.  Tr. 58-59.
The VE provided national job incidence data for the identified jobs.  Tr. 59.

For his third hypothetical, the ALJ asked the VE to consider the individual described in
the first hypothetical except the individual would be limited to sedentary rather than light work.

---

[3] The hearing transcript reads assembler plastic optical products.  Tr. 57-58.  However, the DOT number for the job
identified (DOT number 712.687-010) corresponds to assembler plastic hospital products.  *See*
https://occupationalinfo.org/71/712687010.html (last visited 10/8/2019).

Tr. 59.  The VE indicated that Harris's past work would not be available and the individual would not have acquired any skills in the past work that would transfer into a job that the individual could perform.  Tr. 59.

For his fourth hypothetical, the ALJ asked the VE to consider an individual who would be off task 20% of the time.  Tr. 59.  The VE indicated that such an individual would not be able to maintain or retain employment in any job in the local or national economy.  Tr. 60.  On further questioning by Harris's counsel, the VE indicated that being off task 15% or more would become work preclusive.  Tr. 61.

For his fifth hypothetical, the ALJ asked the VE to consider an individual who would be absent two times per month on an ongoing basis.  Tr. 60.  The VE indicated that the described individual would be unable to maintain or retain employment in any job in the local or national economy.  Tr. 60-61.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[4] . . . .

---

[4] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1.  If claimant is doing substantial gainful activity, he is not disabled.

2.  If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.  If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[5] claimant is presumed disabled without further inquiry.

4.  If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.  If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

---

[5] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience. 20 C.F.R. § 404.1525.

In his December 7, 2017, decision the ALJ made the following findings:[6]

1.  Harris last met the insured status requirements of the Social Security Act on September 30, 2016.  Tr. 14.

2.  Harris did not engage in substantial gainful activity during the period from his alleged onset date of February 26, 2014, through his date last insured of September 30, 2016.  Tr. 14.

3.  Through the date last insured, Harris had the following severe impairments: degenerative disc disease and other arthropathies of the upper extremities.  Tr. 14.

4.  Through the date last insured, Harris did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 14-15.

5.  Through the date last insured, Harris had the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b) except he can occasionally push or pull and reach overhead with the right upper extremity.  He can never climb ladders, ropes or scaffolds.  He can occasionally crawl.  He can frequently handle and finger on the right.  He must avoid all exposure to hazards such as unprotected heights, moving machinery, and commercial driving.  Tr. 15-18.

6.  Through the date last insured, Harris was unable to perform any past relevant work.  Tr. 18.

7.  Harris was born in 1963 and was 53 years old, which is defined as an individual closely approaching advanced age, on the date last insured.  Tr. 18.

8.  Harris has at least a high school education and is able to communicate in English.  Tr. 19.

9.  Transferability of job skills is not material to the determination of disability.  Tr. 19.

10. Through the date last insured, considering Harris's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Harris could perform, including inspector and hand packager, assembler of plastic hospital products, and assembler of electrical accessories.  Tr. 19-20.

---

[6] The ALJ's findings are summarized.

Based on the foregoing, the ALJ determined Harris had not been under a disability, as defined in the Social Security Act, from February 26, 2014, the alleged onset date, through September 30, 2016, the date last insured.  Tr. 20.

## V. Plaintiff's Arguments

Harris argues that reversal and/or remand is required because: (1) the ALJ erred by finding that Harris's  degenerative disc disease did not meet or equal a Listing; (2) the ALJ erred by failing to develop the record to obtain an opinion of Harris's functioning because the state agency reviewing physicians that the ALJ relied upon did not have all the evidence; and (3) Harris's  case was adjudicated by an improper and unconstitutionally appointed ALJ.  Doc. 14, Doc. 17.

## VI. Law & Analysis

### A.     Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence

supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**B.     Reversal and remanded is warranted because, without further articulation, the Court cannot determine whether the Step Three finding and/or the RFC are supported by substantial evidence**

**1.   Reversal and remand is required for further analysis at Step Three**

Harris argues that the ALJ erred because he failed to conduct an analysis at Step Three as to whether his degenerative disc disease met or equaled Listing 1.04 – Disorders of the Spine.

A claimant who is found to have an impairment that meets or medically equals a Listing at Step Three is entitled to benefits regardless of an ALJ's conclusions at Steps Four or Five. *Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 416 (6th Cir. 2011). Thus, without an ALJ's evaluation of the evidence, comparison of that evidence to the Listings and an explanation of the conclusion reached, meaningful judicial review cannot occur and "it is impossible to say that the ALJ's decision at Step Three was supported by substantial evidence." *Id.* (*citing Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996); *see also Brock v. Colvin*, 125 F.Supp.3d 671, 673 (N.D. Ohio 2015) (reversing Commissioner's decision because "the ALJ's unexplained conclusion [at Step Three] [was] insufficient to permit meaningful judicial review" of the ALJ's Step Three determination); *May v. Astrue*, 2011 U.S. Dist. LEXIS 88551, *24-25 (N.D. Ohio June 1, 2011) *report and recommendation adopted*, *May v. Astrue*, 2011 U.S. Dist. LEXIS 88548 (N.D. Ohio Aug. 10, 2011).

Listing 1.04 provides:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

A.     Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)[.]

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.04(A).  Harris contends that he presented evidence to establish that he met or medically equaled Listing 1.04 but that the ALJ did not explain how the evidence did not show that his impairments met or equaled the Listing.

The entirety of the ALJ's Step Three analysis is as follows:

The undersigned has reviewed the medical evidence as described in Sections 1.02[7] and 1.04 of the Listing of Impairments in Appendix 1, Subpart P, Regulations Part 404.  There are no indicated findings by treating or examining physicians that satisfy the requirements of any listed impairment.  Therefore, the undersigned finds the claimant does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.  These sections are discussed more fully in Finding #5 below.

Tr. 15.

As is clear, at Step Three the ALJ did not analyze the evidence in comparison to Listing 1.04.  And while he suggested that there would be more analysis later in his decision by stating "These sections are discussed more fully in Finding #5 below[,]" (Tr. 15 (emphasis supplied)), the ALJ provided no such analysis.  Within Finding #5, the ALJ summarized the evidence and briefly discussed the medical opinion evidence.  There is no analysis as to how the evidence was evaluated in relation to Listing 1.04.

---

[7] In this appeal, Harris does not argue that his impairments meet or equal Listing 1.02 or any other listing.

The Commissioner contends that the ALJ's failure to articulate his Listing 1.04(A) analysis was harmless because Harris cannot show that he meets or equals the listing. In asserting harmless error, the Commissioner argues that Harris cannot demonstrate nerve root compression until after the expiration of the date last insured of September 30, 2016, because the MRI showing spinal cord compression is dated October 4, 2016.

Harris does bear the burden of demonstrating the onset of disability prior to his date last insured. *Kingery v. Comm'r of Soc. Sec.*, 142 F.Supp.3d 598, 602 (S.D. Ohio 2015). And "'[e]vidence of disability obtained after the expiration of insured status is generally of little probative value.'" *Id.* (quoting *Strong v. Soc. Sec. Admin.*, 88 Fed. Appx. 841, 845 (6th Cir. 2004). Nevertheless, evidence post-dating a date last insured may be relevant where it relates back to a claimant's condition before his date last insured. *Id.* (citing *Wirth v. Comm'r of Soc. Sec.*, 87 Fed. Appx. 478, 480 (6th Cir. 2003)).

Here, Harris points to evidence other than the October 4, 2016, MRI findings to argue that his impairments met or equaled Listing 1.04. *See* Doc. 14, pp. 12-13 (citing to an April 7, 2015, MRI showing mild to moderate canal stenosis and mild to severe foraminal narrowing at various c-spine levels; Harris's reports of radiating pain into his shoulders and arms; and examinations noting muscle weakness, decreased range of motion, decreased strength in the hands; diminished fine touch and vibration sense; and diminished reflexes in the right upper extremity). Furthermore, while the October 4, 2016, MRIs post-date the date last insured of September 30, 2016, they do so by only four days and Harris's impairment is of a degenerative nature. Considering the close proximity of October 4, 2016, MRI evidence to the date last insured coupled with the degenerative nature of Harris's impairments, the ALJ's lack of articulation at Step Three or anywhere else in the decision cannot be deemed harmless. The ALJ

did not analyze the October 4, 2016, MRI findings as they pertained to Listing 1.04 nor did the ALJ explain how the other evidence of record pre-dating the date last insured did not demonstrate that Harris's impairment met or at least equaled Listing 1.04 before the date last insured.

For the reasons stated herein, the Court finds that reversal and remand is required for further articulation at Step Three regarding Listing 1.04(A).

**2. Without further articulation, the Court is unable to assess whether the RFC is supported by substantial evidence**

Harris argues that the RFC is not supported by substantial evidence. He contends that the ALJ should have obtained an opinion regarding Harris's functional capacity but instead relied on the opinions of state agency reviewing physicians who did not review the entire medical record and on his own interpretation of the medical evidence for the period of time following the reviewing physicians' assessments.

An ALJ is not precluded from considering and relying upon opinions of state agency reviewing physicians even when those physicians have not reviewed the entirety of the record. *See Helm v. Comm'r of Soc. Sec.*, 405 Fed. Appx. 997, 1002 (6th Cir. 2011) ("There is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record.") (discussing SSR 96-6p, 1996 WL 374180, at *2 (1996)). "Where a non-examining source did not review a complete case record, [courts] require some indication that the ALJ at least considered these facts before giving greater weight to that opinion." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) (internal quotations omitted)). However, in all cases, the RFC must be supported by substantial evidence.

Here, the only medical opinions in the record relating to Harris's impairments were opinions rendered by state agency reviewing physicians in June 2016 (Tr. 69-72) and August 2016 (Tr. 81-83). In considering these opinions, the ALJ stated:

> As for the opinion evidence, the undersigned has considered the assessments by the medical examiners employed by the State Disability Determination Services whose assessments supported a finding of "not disabled." Although those physicians are non-examining, their opinions do not as a general rule deserve as much weight as those of examining or treating sources. However, their opinions must be considered and assigned weight (Teresita Cruz, M.D. dated June 7, 2016 and Lynne Torello, M.D. dated August 16, 2016 (Exs. 3A, 5A).
>
> The State Agency medical examiners determined the claimant could do light work. He could never climb ladders, ropes, and scaffolds. He could occasionally crawl. He could occasionally reach overhead and frequently handle, finger, and feel with the right upper extremity. He needed to avoid all exposure to hazards (machinery, heights, etc.).
>
> The undersigned gives their assessments great weight because the updated evidence did not change the assessment. The State Agency medical examiners are familiar with the evaluation of disability according to SSA rules and regulations.

Tr. 18.

While the ALJ identified and described the opinions and stated that he assigned great weight to them, he did not explain why he assigned great weight other than stating that updated evidence did not change the opinions.

Also, although it is the ALJ's responsibility to consider and weigh the evidence, the ALJ provided no analysis of the updated evidence. The ALJ noted that there was updated medical evidence but proceeded to summarily state the updated evidence did not change the state agency reviewing physicians' assessments. The ALJ summarized the updated evidence when recounting Harris's medical treatment history. Tr. 17-18. However, the ALJ did not explain how the updated evidence, i.e., September 2, 2016, examination findings, which included an antalgic and

cautious gait as well as diminished and/or absent reflexes, and the October 4, 2016, MRIs, did not change the state agency reviewing physicians' assessments.

The Commissioner acknowledges that the October 2016 MRIs showed changes but contends that reversal is not warranted because the ALJ stated he considered the evidence and because the later evidence post-dates Harris's date last insured, making the evidence not relevant. Doc. 16, p. 15. However, as discussed above, the October 4, 2016, MRIs were taken only 4 days after Harris's date last insured. Additionally, one of Harris's severe impairments was _degenerative_ disc disease (Tr. 14) and the record does not reflect a traumatic event occurring between the date last insured, September 30, 2016, and the date of the MRIs.

While the October 2016 MRIs post-date the date last insured, considering the short gap of time between the date last insured and those MRIs as well as the lack of a more complete analysis by the ALJ regarding that later evidence, the undersigned is unable to discern a basis upon which the ALJ concluded that the evidence post-dating the state agency reviewing physicians' opinions did not change those assessments and/or why those opinions were entitled to great weight. Thus, without further articulation, the Court is unable to assess whether the RFC is supported by substantial evidence. Accordingly, remand is required for further articulation and/or evaluation of the evidence.

Harris also argues that the ALJ did not fully and fairly develop the record because he did not obtain a further opinion regarding Harris's functional ability based on all the record evidence. Because of the incomplete analysis, the Court cannot say that the ALJ's failure to call a medical expert was error in this case. *See e.g., Davis v. Chater*, 104 F.3d 361, 1996 WL 732298, * 2 (6th Cir. 1996) (Table) (indicating an ALJ is not required to call a medical expert); *see also Williams v. Callahan*, 1998 WL 344073, *4 n. 3 (6th Cir. 1998) (indicating that, where

the record contains sufficient evidence for an ALJ to decide a disability claim absent expert

medical testimony, a failure to solicit expert medical testimony will not serve as a basis to

reverse an ALJ's decision).  Nevertheless, on remand, the Commissioner should consider

whether a medical expert or further medical opinion is necessary.

**C.       Harris's Appointments Clause challenge is not a basis for reversal and remand**

Harris argues that the ALJ who decided his case was not properly appointed, relying on

the Supreme Court decision *Lucia v. Securities & Exchange Commission*, 138 S.Ct. 2044 (2018).

He asserts that his case should be remanded and assigned to a different and constitutionally

appointed ALJ.

In *Lucia*, the United States Supreme Court held that Securities and Exchange

Commission administrative law judges qualified as "Officers" must be appointed pursuant to the

Appointments Clause of the U.S. Constitution;[8] because the administrative law judge in that case

had not been so appointed, the plaintiff was entitled to a new hearing by a new and properly

appointed administrative law judge.  138 S.Ct. at 2055.  *Lucia* did not address whether Social

Security administrative law judges are "Officers" who also must be appointed pursuant to the

Appointments Clause.

For purposes of the briefing submitted by the Commissioner in this appeal, the

Commissioner does not argue that SSA ALJs are employees rather than "Officers."  Doc. 16, p.

4, n. 2.  However, relying on the Supreme Court's statement in *Lucia* that "one who makes a

*timely* challenge to the constitutional validity of the appointment of an officer who adjudicates

his case" is entitled to relief.  Doc. 16, p. 4 (quoting *Lucia*, 138 S.Ct. at 2055) (emphasis supplied

by Commissioner)), the Commissioner contends that Harris forfeited his Appointments Clause

---

[8]  The Appointments Clause provides "[o]nly the President, a court of law, or a head of department" can appoint
"Officers."  *Lucia*, 138 S.Ct. at 2051 (citing Art. II, § 2, cl. 2).

claim because he failed to assert a challenge to the ALJ's appointment during the administrative proceedings. Harris does not argue that he raised his Appointments Clause claim during the underlying administrative proceedings. He contends that exhaustion was not required. He also argues that this appeal was the first opportunity he had to raise such a challenge because the Appeals Council denied his request for review on June 27, 2018, only six days after *Lucia* was issued. Additionally, Harris argues that that, even if he did forfeit his claim, the forfeiture should be excused because raising the claim would have been futile.

The Court has considered Harris's arguments, which are similar to arguments previously considered and rejected by this and other courts. *See Fisher v. Comm'r of Soc. Sec.*, 2019 WL 4233463, ** 1-4, 11-13 (N.D. Ohio Sept. 6, 2019) (adopting report and recommendation as to Appointments Clause challenge due to failure to raise the issue at the agency level). Having done so, the Court finds that Harris failed to timely raise his Appointments Clause challenge and such failure is not excused.

## VII. Conclusion

For the reasons set forth herein, the Court finds that Harris's Appointments Clause challenge is not a basis for reversal and remand. However, for the reasons discussed herein the Court is unable to assess whether the Step Three determination and/or the RFC are supported by substantial evidence. Thus, the Court **REVERSES and REMANDS** the Commissioner's decision for further proceedings consistent with this opinion.[9]

Dated: October 8, 2019

*/s/ Kathleen B. Burke*

Kathleen B. Burke
United States Magistrate Judge

---

[9] In reversing and remanding this case, the Court makes no determination as to whether the evidence establishes that Harris was disabled within the meaning of the Social Security Act prior to his date last insured.